WILLIAM MOSHIER *v.* ROGER GOODNOW ET AL.
(14125)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, HULL and BORDEN, Js.

Argued December 4, 1990—decision released February 5, 1991

*Jeremiah Donovan,* with whom was *Terry Sablone,* for the appellants (defendants).

*Lynda B. Munro,* with whom was *Michael J. Wells,* for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is the scope of the taxing authority retained by a town's board of selectmen after the town's electors have voted to reject town budgets recommended by the town's board of finance. The plaintiff, William Moshier, a taxpayer of the town of Old Saybrook,[1] filed a complaint alleging that, because the town's electors had defeated four proposed 1990–91 budgets, the defendants, the town's

[1] Although the plaintiff sought to bring his action as a class action on behalf of all the taxpayers of the town of Old Saybrook, the trial court made no ruling concerning his request for class action certification.

board of selectmen,[2] should be enjoined from collecting any taxes in accordance with a July 18, 1990 tax levy based on estimated unreimbursed expenditures for the 1990–91 fiscal year. After a hearing, the trial court issued an order temporarily enjoining the defendants from collecting any taxes. Pursuant to General Statutes § 52-265a,[3] the defendants received permission to file an immediate expedited appeal from this interlocutory order.[4] We now reverse the judgment of the trial court and direct that judgment be rendered in favor of the defendants.

---

[2] The defendants are Roger Goodnow, Carl Von Dassel and Robert Fish, individually and as the board of selectmen for the town of Old Saybrook, and Olive D. Mulvihill, individually and as tax collector for the town of Old Saybrook.

[3] General Statutes § 52-265a provides: "DIRECT APPEAL ON QUESTIONS INVOLVING THE PUBLIC INTEREST. (a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the superior court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the supreme court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The chief justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the chief justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the chief justice, who shall thereupon call a special session of the supreme court for the purpose of an immediate hearing upon the appeal.

"(d) The chief justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

The "order or decision" to which § 52-265a (a) refers need not be a final judgment. *Laurel Park, Inc.* v. *Pac,* 194 Conn. 677, 678–79 n.1, 485 A.2d 1272 (1984). Accordingly, this appeal is not jurisdictionally defective even though the defendants are appealing a temporary injunction, which, as an interlocutory order, would otherwise not be immediately appealable. Id.

[4] Although the trial court denied the defendants' application for a stay of the temporary injunction pending the resolution of the defendants' appeal,

## I

On October 25, 1990, subsequent to the filing of the defendants' appeal, the electors of the town approved a 1990–91 fiscal year budget. Pursuant to the new budget, the town's board of finance that same day set a new mill rate identical to that which had earlier been established in the defendants' contested rate bill of July 18, 1990.[5] Since the plaintiff's complaint does not challenge the validity of the October 25 budget or the new mill rate, the first issue that we must decide is whether the defendants' appeal must be dismissed as moot.

The standards governing mootness are well established. Because this court has no jurisdiction to give advisory opinions, no appeal can be decided on its merits in the absence of an actual controversy for which judicial relief can be granted. *Sobocinski* v. *Freedom of Information Commission,* 213 Conn. 126, 134–35, 566 A.2d 703 (1989); *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 571, 499 A.2d 1158 (1985); *Waterbury Hospital* v. *Connecticut Health Care Associates,* 186 Conn. 247, 249–50, 440 A.2d 310 (1982);

this court overturned that ruling and granted the stay. The parties then agreed that moneys received by the tax collector between October 11, 1990, the date of the injunction, and October 22, 1990, the date of our order granting the stay, would be held in escrow pending the final resolution of this appeal.

[5] On October 25, 1990, the electors of the town of Old Saybrook by referendum approved a 1990–91 budget in the amount of $17,152,153. That amount was $444,600 less than the disputed estimated expenditure figure of $17,596,753 used by the board of selectmen in setting a mill rate and levying a tax on July 18, 1990. Following the adoption of the October 25, 1990 budget, the board of finance nonetheless set the same mill rate of 13.5 that had earlier been set by the board of selectmen. This choice of mill rate reflected decreases in projected revenues, downward adjustments to the grand list, and reconsideration of the propriety of forecasting a 95 percent collection rate.

*Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* 177 Conn. 17, 19, 411 A.2d 1 (1979); *Reynolds* v. *Vroom,* 130 Conn. 512, 515, 36 A.2d 22 (1944). The mill rate that the trial court's interlocutory injunction rendered unenforceable has now been validated, for the future, by the action of the town's electors. This ratifying action, which indubitably requires dissolution of the injunction against collecting further taxes, raises a serious question about the continued viability of any part of the defendants' appeal.

The parties in their briefs urge us nonetheless to reach the merits of the appeal on the theory that this case is an instance of a moot question that is "capable of repetition, yet evading review." See *Weinstein* v. *Bradford,* 423 U.S. 147, 148–49, 96 S. Ct. 347, 46 L. Ed. 2d 350 (1975); *Sobocinski* v. *Freedom of Information Commission,* supra, 135; *Delevieleuse* v. *Manson,* 184 Conn. 434, 437, 439 A.2d 1055 (1981). In deciding whether to invoke this mitigating principle, we have considered not only the practical difficulties of timely judicial review but also "(1) the public importance of the question presented; (2) the potential effect of the ruling on an ongoing program of the state's penal or civil system; and (3) the possibility of a similar effect on the plaintiff himself in the future." *Shays* v. *Local Grievance Committee,* supra, 572–73; *Waterbury Hospital* v. *Connecticut Health Care Associates,* supra, 253 n.5; *Delevieleuse* v. *Manson,* supra. The present appeal does not satisfy either of the latter two criteria: no ongoing program of the state is at issue and the future relationship between this taxpayer and his town's budgets is speculative at best. Although straitened economic times may portend increased taxpayer resistance to rising property tax rates, that political fact of life does not, in and of itself, prevent an appeal from becoming moot if no actual or practical relief can follow from our determination.

At oral argument, however, the plaintiff suggested a practical consequence that might attach to a decision in this appeal. Having failed to pay the local taxes as assessed, the amount of his liability for interest will depend upon the date on which the effective mill rate was legally set. Because his interest liability will be greater if the defendants had the independent authority to set the mill rate in July than if that authority depended upon the favorable town referendum in October, he claims that the defendants' appeal is not moot. The defendants have not challenged the accuracy of the plaintiff's representation about his tax delinquency or its consequences. Taking this fact in conjunction with the importance of the issue raised, and the difficulty of timely appellate review, we conclude that the relief we might grant is not so de minimis as to require us to dismiss the defendants' appeal.

## II

On the merits, the dispositive issue is one of statutory construction. The defendants contend that, despite four town referenda rejecting budgets proposed by the town's board of finance, General Statutes §§ 7-344 and 12-123[6] authorized them to set a mill rate and to levy

---

[6] General Statutes § 7-344 provides in relevant part: "APPROPRIATIONS. LAYING OF TAX. . . . Immediately after the board of tax review has finished its duties and the grand list has been completed, the board of finance shall meet and, with due provision for estimated uncollectible taxes, abatements and corrections, shall lay such tax on such list as shall be sufficient, in addition to the other estimated yearly income of such town and in addition to such revenue surplus, if any, as may be appropriated, not only to pay the expenses of the town for such current year, but also to absorb the revenue deficit of such town, if any, at the beginning of such current year. . . ."

General Statutes § 12-123 provides: "SELECTMEN TO MAKE RATE BILL WHEN TOWN FAILS TO LAY SUFFICIENT TAX. When any town has failed to lay necessary taxes or to lay a tax which, in addition to the other estimated yearly income of the town, is sufficient to pay the current expenses of such

taxes based on an informed estimate concerning projected town expenditures *for 1990–91.* Relying on figures generated by the board of finance about estimated expenditures, reduced by estimated revenues from nontax sources and adjusted for the estimated collection rate, they determined that a mill rate of 13.5 would generate the necessary tax revenues.[7] The plaintiff has challenged neither the mathematical accuracy of the defendants' calculations nor the necessity of the expenditures proposed to be financed. He maintains instead that General Statutes § 7-405[8] limited the scope of the defendants' authority to the setting of interim budgets based on the line item limits *for 1989–90.* The

town, its selectmen shall make a rate bill upon its list last completed for the amount necessary, or for an amount sufficient to pay the deficit in such current expenses, and cause the same to be collected as other taxes."

[7] One significant factor leading to an increase in projected expenditures for the fiscal year 1990–91 was the increase in the town's bonded indebtedness that had previously been approved by town referenda. The named defendant testified, without contradiction, that the town's required payments of principal and interest had increased by about $1,200,000, from $556,000 for 1989–90, to $1,770,153 for 1990–91.

[8] General Statutes § 7-405 provides: "EXPENDITURES BEFORE ADOPTION OF BUDGETS. When annual appropriations have not been made by a municipality before the beginning of any fiscal year, the disbursing officers may make necessary expenditures during the period of ninety days after the beginning of such year on proper warrants for purposes and in amounts authorized by the appropriating body or by the board of finance or other budget-making authority. When annual appropriations have not been made by such municipality before the end of such ninety-day period, the disbursing officers may make necessary expenditures during successive monthly periods in such year on proper warrants for purposes and in amounts authorized by the appropriating body or by the board of finance or other budget-making authority within the limits of appropriations specified in budgetary line items for the previous fiscal year. For this purpose, necessary borrowing may be authorized by resolution of the budget-making authority, provided all such borrowing shall mature and be payable not later than the end of the fiscal year for which such borrowings are made. Any notes so authorized may be issued and sold in the manner provided by such resolution. Such expenditures authorized by this section and interest costs and other expenses incidental to any such borrowing shall constitute the first charges against appropriations for the fiscal year in which they are made."

trial court, agreeing with the plaintiff, concluded that "[t]he board of selectmen was in error in adopting the board of finance's recommendation of July, 1990. The board of selectmen should have adopted the budgetary items from the fiscal year 1989–90." We disagree.

Only one Connecticut case has considered the scope of municipal authority to fix a mill rate in the face of formal rejection of a proposed town budget. In *State ex rel. Feigl* v. *Raacke,* 32 Conn. Sup. 237, 241–44, 349 A.2d 150 (1975), the court construed § 12-123 to sustain the discretionary authority of a board of selectmen to establish a proper mill rate for current expenses in such circumstances. The court permitted the selectmen to base their mill rate on the operating budget earlier requested and recommended by the board of finance pursuant to § 7-344, even though that recommended budget had been disapproved by the town meeting. Id., 239.

The plaintiff contends that, even if we were inclined to follow *Feigl,* its holding has been undermined by subsequent statutory revision. When a town has failed "to lay necessary taxes or to lay a tax . . . sufficient to pay the current expenses of such town," § 12-123 authorizes the town's selectmen to "make a rate bill upon its list last completed for the amount necessary, or for an amount sufficient to pay the deficit in such current expenses . . . ." The plaintiff maintains that the meaning of "current expenses" in § 12-123 must be determined by reference to a 1977 amendment to § 7-405. Public Acts 1977, No. 77-384. That section addresses the authority of a municipality's disbursing officers to make necessary expenditures whenever "annual appropriations have not been made by a municipality before the beginning of any fiscal year." For the first ninety days, § 7-405 permits necessary expenditures to be made in accordance with amounts autho-

rized by the municipal "appropriating body or by the board of finance or other budget-making authority." After the initial ninety day period, however, § 7-405 limits even authorized disbursements to "appropriations specified in budgetary line items for the previous fiscal year." When *Feigl* was decided, prior to the 1977 amendment to § 7-405, the statutes contained no provisions for ongoing municipal expenditures beyond the initial ninety day period. The plaintiff maintains that, since 1977, the authority conferred upon selectmen by § 12-123 to levy taxes to meet "current expenses" must be read in pari materia with § 7-405 so as to permit only an initial ninety day budget and thereafter to permit only monthly determinations of a mill rate set by reference to "budgetary line items for the previous fiscal year." We are unpersuaded.

The linchpin of the plaintiff's argument is his assertion that §§ 12-123 and 7-405 jointly address and circumscribe the discretion of selectmen to levy taxes. The language of the two statutes belies this argument. The authority conferred upon selectmen by § 12-123 is on its face greater than that conferred upon disbursing officers by § 7-405. Under § 12-123, selectmen have unlimited authority to "make a rate bill upon [the] list last completed" to pay necessary expenses when, as in this case, the town has "failed to lay necessary taxes." The selectmen's authority to remedy a deficit in funding for "current expenses" arises only when the town has failed to lay a tax "sufficient to pay" such expenses, i.e., when a budget properly voted is insufficient to meet town needs. There is nothing in § 12-123, read in its entirety, to suggest a limiting construction for "current expenses." Taxing authorities are generally afforded broad discretion in setting tax rates. 16 E. McQuillin, Municipal Corporations (3d Ed. 1984) § 44.100, and cases therein cited. By contrast, nothing

in § 7-405 suggests that disbursing officers are granted, or should be granted, similarly broad authority. The legislative history of the 1977 amendment to § 7-405 makes clear that its purpose was to provide some flexibility for a board of finance to authorize interim disbursements after a ninety day temporary budgetary process had failed to produce a permanent budget. The constraints contained therein were not addressed to the taxing authority of the board of selectmen.

We are equally unpersuaded that the 1977 amendment to § 7-405 was a legislative effort to overturn *Feigl*. Had the legislature intended such a result, the logical path would have been to amend § 12-123 or § 7-344. Failing that, the legislative history would have disclosed some reference to *Feigl*, to an intent to limit the authority of boards of selectmen, or, finally, to a perceived connection between the amendment to § 7-405 and the unamended § 12-123 or § 7-344. The legislative record indicates, to the contrary, that the focus of the legislative deliberations was the scope of additional authority for interim financing that might be conferred on disbursing agents and boards of finance, and not the authority previously conferred on boards of selectmen.[9]

We conclude that *Feigl* correctly construed § 12-123 as vesting broad statutory authority in boards of selectmen to set tax rates for their towns when the defeat

---

[9] Committee Bill No. 719, which was the legislative antecedent of Public Acts 1977, No. 77-384, § 1, amending General Statutes § 7-405, never purported to amend General Statutes § 12-123. Early versions of the committee bill contained differing authorizations for interim tax levies by boards of finance, either at the same rate as in the previous year, or at a higher rate needed to pay necessary expenditures. The legislative record does not reveal why all references to interim tax levies were deleted in the bill as finally enacted. Senator Audrey Beck, a sponsor of the bill in its final form, indicated, however, that the bill was concerned with the authority of boards of finance rather than that of boards of selectmen. 20 S. Proc., Pt. 7, 1977 Sess., p. 2525.

of a town budget has created a fiscal vacuum. Despite voter disapproval, the legislature provided a mechanism by which presently accruing town bills could be met even if they exceeded a prior year's budgetary line item. Such a construction of § 12-123 does not leave a disapproving taxpayer remediless. In the event that a subsequently approved budget reduces the town's authorized expenditures, a taxpayer may be entitled to recover excess assessments or to claim a corresponding reduction in his tax bill for the following tax year. See General Statutes § 7-344; *Caulfield* v. *Noble*, 178 Conn. 81, 85, 420 A.2d 1160 (1979). A taxpayer, however, has no statutory right to enjoin collection of taxes that are not an abuse of the broad discretion conferred upon boards of selectmen by § 12-123.

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other justices concurred.